## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>*ex rel.* HEATHER MONDEE, )<br> )<br> Plaintiffs, )<br> )<br> v. )<br> )<br>TOIFOR GLOBAL LIFE )<br>SUPPORT SERVICES, )<br> )<br> and )<br> )<br>XELESS, )<br> )<br> and )<br> )<br>ULRICH HORSMANN, )<br> )<br> and )<br> )<br>KEVIN LAYNE, )<br> )<br> and )<br> )<br>ALVO VIEWEG, )<br> )<br> and )<br> )<br>PAUL HELE, )<br> )<br> and )<br> )<br>HENRY OMONOBI-NEWTON, )<br> )<br> and )<br> )<br>EVEREST FAIZY LOGISTICS SERVICES, )<br> ) | Civil No._____<br><br><br><br><br>**COMPLAINT FOR<br>VIOLATIONS OF THE<br>FALSE CLAIMS ACT<br>31 U.S.C. §§ 3729 *ET SEQ.*<br><br><br><br><br><br>FILED UNDER SEAL<br><br><br><br>JURY TRIAL DEMANDED** |

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States of America ex rel. MonDee v. TOIFOR et al.*

1

|  | ) |
|---|---|
| **and** | ) |
|  | ) |
| **HIKMAT SUPPLY AND** | ) |
| **CONSTRUCTION COMPANY,** | ) |
|  | ) |
| **and** | ) |
|  | ) |
| **HIKMAT SHADMAN LOGISTICS** | ) |
| **SERVICES COMPANY,** | ) |
|  | ) |
| **and** | ) |
|  | ) |
| **HEKMAT SHADMAN GENERAL** | ) |
| **TRADING, LLC,** | ) |
|  | ) |
| **Defendants.** | ) |
|  | ) |
|  | ) |

## INTRODUCTION

1.     This is a civil action brought by the United States against Defendants, under the False Claims Act, 31 U.S.C. §§ 3729-33 (the "FCA"), and civil penalties and restitution owed to, the United States based on Defendants' violations of the FCA as well as the Anti-Kickback Statute (the "AKS"), 42 U.S.C. § 1320a-7b(b), for knowingly submitting false claims to the government for purposes of obtaining payment and for engaging in an illegal kickback and bribery scheme to secure subcontracts on a NATO contract in Afghanistan.

2.     The United States Government pays contractors and subcontractors through NATO to resupply military forces in Afghanistan. The Government does so through employing Afghan sub-contractors to transport supplies to U.S. military forces through Afghanistan.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States of America ex rel. MonDee v. TOIFOR et al.*

3.      The United States' resupplying efforts are administered by NATO's Maintenance and Supply Agency ("NAMSA"). NAMSA then awards missions to subcontractors using Transportation Movement Request ("TMR") forms.

4.      Recently, NAMSA, the Central Europe Pipeline Management Agency (CEMPA), and the NATO Airlift Management Agency (NAMA) were all combined to form the NATO Support Agency (NSPA).[1]

5.      The subcontractors transport supplies to U.S. and NATO military forces using decorated trucks commonly known as Jingle Trucks. Therefore, the United States contract administered by NATO is known as the "Jingle Truck" or the "Bulk Transport" contract.

6.       Since before November 2010 until August 2013, Defendants knowingly engaged in fraudulent bribery and kickback schemes to secure subcontracts of the Jingle Truck contract.

7.      Relator witnessed the fraud and disclosed information to several SIGAR agents, which in turn began an investigation into the actions of the Defendants.

8.      Based on Relator's disclosures, from 2011 to August 2013, the United States Government brought an *in rem* action against several bank accounts to seize assets of several individuals and entities named as Defendants in this complaint.

9.      The U.S. Government has monitored and continues to monitor other individuals and companies, domestic and foreign, and there should be possible additional causes of action to this Complaint.

---

[1] NATO's Maintenance and Supply Agency ("NAMSA"), is now known as The NATO Supply AGENCY ("NSPA"). To avoid confusion, this Complaint refers to the agency as NAMSA, whether operating under the name NSPA or NAMSA.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States of America ex rel. MonDee v. TOIFOR et al.*

3

10.    Relator is the original source of information which served as the basis for the U.S. Government's *in rem* action against the Defendants.

11.    Relator is filing this Complaint to pursue alternative remedies available to her under the Federal False Claims Act and preserve her rights to alternative remedies.

12.    Relator is filing this Complaint to preserve her right to an alternate remedy in the United States Government's action against the named Defendants (Case No. 12-cv-01905 (RWR)).

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a).

14.    MonDee's federal cause of action for unlawful retaliation is authorized by 31 U.S.C. § 3730(h).

15.    MonDee brings this action for violations of the Federal False Claims Act in the name of the United States Government, "for the person and for the Government," pursuant to 31 U.S.C. § 3730(b)(1).

16.    This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a), because the Defendants have engaged in activities that directly defraud the United States Government.

17.    This Court has personal jurisdiction over this action pursuant to 28 U.S.C. §1345, as MonDee brings this action in the name of the United States Government and is therefore an agent of the Government.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States of America ex rel. MonDee v. TOIFOR et al.*

4

18.     Venue is proper in this Court under 28 U.S.C. §1391(c), 1395(a), and 31 U.S.C. § 3732(a), because the Defendants are subject to this Court's personal jurisdiction.

## PARTIES

19.     Relator Heather MonDee is a citizen of the United States and resides in Denver, Colorado.

20.     Relator was in Kabul and Kandahar, Afghanistan, from January 2010 through May 2012.

21.     Relator was the liaison between two subcontractors, Gulalai Transportation Company ("GTC) and Doran Transportation Company ("DTC") and TOIFOR the Jingle Truck contract.

22.     TOIFOR Global Life Support Services ("TOIFOR"), is a Hungarian firm located at Kandahar Airfield, Afghanistan. TOIFOR is the sole contractor to NAMSA under NATO's Jingle Truck contract.

23.     In 2011, TOIFOR changed its name to Xeless. To avoid confusion, this Complaint refers to this company as TOIFOR, whether operating as TOIFOR or Xeless

24.     Ulrich Horsmann ("Horsmann") is the Chief Executive Operator of TOIFOR.

25.     Kevin Layne ("Layne") was the TOIFOR Operations Manager from in or about November 2010 until in or about September 2011.

26.     Alvo Vieweg ("Vieweg") was the TOIFOR Managing Partner in Afghanistan until his termination on or about late May 2011.

27.     Henry Omonobi-Newton ("Newton") became the TOIFOR Operations Manager at Kandahar Airfield after Vieweg's termination in or about late May 2011.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States of America ex rel. MonDee v. TOIFOR et al.*

28.     Paul Hele ("Hele") became TOIFOR's Operations Manager in 2011, after Newton left TOIFOR.

29.     Everest Faizy Logistics Services ("Everest") is an Afghan operated company that operated as one of TOIFOR's subcontractors on the Jingle Truck contract. Everest is owned and operated by Afghan national Rohullah LNU[2] ("Rohullah").

30.     Hikmat Supply and Construction Company ("HSCC") is an Afghan operated company that operated as one of TOIFOR's subcontractors on the Jingle Truck contract. HSCC is owned and operated by Afghan national Hikmatullah Shadman ("Hikmatullah"), the brother of Rohullah.

31.     Hikmat Shadman Logistics Services Company ("HSLSC") is an Afghan operated company that operated as one of TOIFOR's subcontractors on the Jingle Truck contract. HSLSC is owned and operated by Afghan national Hikmatullah Shadman ("Hikmatullah"), the brother of Rohullah.

32.     Hekmat Shadman General Trading, LLC ("HSGT") is an Afghan operated company that operated as one of TOIFOR's subcontractors on the Jingle Truck contract. HSGT is owned and operated by Afghan national Hikmatullah Shadman ("Hikmatullah"), the brother of Rohullah.

## FACTUAL ALLEGATIONS

**I.      The Relator**

33.     MonDee was in Kandahar and Kabul, Afghanistan, from January 2010 through May 2012.

---

[2] Last name unidentified.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States of America ex rel. MonDee v. TOIFOR et al.*

6

34.     MonDee was the liaison between two subcontractors, Gulalai Transportation Company ("GTC) and Doran Transportation Company ("DTC") and TOIFOR the Jingle Truck contract.

35.     MonDee cooperated with SIGAR and FBI agents to provide detailed information about the fraud Defendants engaged in.

36.     Based on MonDee's disclosures, the U.S. Government brought a successful *in rem* action to freeze the assets of several of the Defendants named in this action (Case No. 12-cv-01905(RWR)).

37.     MonDee was the original source of the information underlying the U.S. Government's action against the named Defendants.

38.     The U.S. Government ordered the seizure of $77,920,605 held at various banks in the names of Hikmatullah Shadman, Hikmat Shadman Logistics Services Company, Faizy Elham Brothers, Ltd., and Everest Faizy Logistics Services.

II.     **NATO's Subcontracting Process**

39.     The United States Government pays Afghan-owned companies known as "subcontractors" through NATO's NAMSA program to transport supplies to U.S. and NATO forces in Afghanistan.

40.     The contractors and subcontractors use various vehicle assets and trucks to deliver supplies to U.S. forces, nicknaming the contract the "Jingle Truck" or "Bulk Transport" contract.

41.     TOIFOR has been the single prime contractor to the Jingle Truck contract under NAMSA since 2007.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States of America ex rel. MonDee v. TOIFOR et al.*

42.     Using a Transportation Movement Request ("TMR"), NAMSA employs a single source contractor, TOIFOR, which then engages local Afghan subcontractors and gives them individual TMRs. TMRs are commonly referred to as missions or mission sheets.

43.     At the end of each quarter, subcontractors are to send TOIFOR a confidential rate sheet, which includes quotes and fees for routes and assets available for their services and TOIFOR is to relay that information to NAMSA and then invoice the United States Government.

44.     TOIFOR selects the subcontractors based on their price quote and the route they selected.

45.     Typically, the four subcontractors with the lowest price quotes.

46.     NAMSA then sends invoices to the U.S. Military Defense Finance and Accounting Services ("DFAS"), requesting that funds be released to NAMSA for payment.

47.     DFAS wires U.S. dollars to NAMSA, which then pays TOIFOR to disburse payment to the local subcontractors.

**III.    Kickbacks and Bribery to Award Fraudulent Subcontracts**

48.     GTC and DTC, two subcontractors which employed MonDee to serve as the expat liaison between them and TOIFOR, complained to her that TOIFOR Operations Manager, Newton approached Afghan subcontractors and demanded bribes in exchange for awarding the subcontractors missions.

49.     MonDee's clients, GTC and DTC, explained to her that if Newton knew that certain subcontractors could not or would not bribe him, he would not even approach those subcontractors.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States of America ex rel. MonDee v. TOIFOR et al.*

8

50.     To hide demanding illegal kickbacks and bribes from Afghan subcontractors in exchange for awarding missions and/or TMRs, TOIFOR altered its accounting practices to stop its monthly billing process.

51.     Afghan subcontractors, during their interactions with MonDee, repeatedly complained to her that TOIFOR was not awarding them missions and /or TMRs because they could not afford to bribe TOIFOR officials.

52.     Afghan subcontractors and MonDee constantly observed that those subcontractors able to provide TOIFOR bribes and kickbacks received numerous missions/TMRs, highly favoring one subcontractor (specifically HSCC) over others.

53.     MonDee and other subcontractors complained to TOIFOR officials about the manipulations and bribes that led to TOIFOR favoring HSCC over all other subcontractors.

54.     When those Afghan subcontractors unable to provide bribes complained to TOIFOR officials, the TOIFOR officials would give the subcontractors various excuses for why they were not awarded the mission. For example, TOIFOR would tell the subcontractors that there were no missions to give out, that the subcontractor had previously provided inadequate services, or simply that TOIFOR had already awarded the mission to HSCC.

55.     Afghan subcontractors unable to provide TOIFOR bribes also complained to NAMSA, but NAMSA did not follow up on the subcontractors' complaints.

56.     Kevin Layne, TOIFOR's Operations Manager, warned Afghan subcontractors not to make complaints about mission allocation to other TOIFOR officials or NAMSA.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States of America ex rel. MonDee v. TOIFOR et al.*

57.     Layne intimidated the subcontractors by explaining to them that he found out about all complaints made about mission allocation, which would then continue to negatively impact the number of missions allocated to the complaining subcontractors.

58.     Layne warned the subcontractors that their complaints would "always get back to [him]."

59.     HSCC is one of the companies that bribed TOIFOR officials for subcontracts and therefore received many subcontracts from TOIFOR.

60.     GTC and DTC did not bribe TOIFOR officials and therefore did not receive any missions/TMRs.

61.     MonDee did not bribe TOIFOR officials and never received or demanded any bribes or kickbacks.

62.     MonDee personally witnessed a continued decrease in the number of missions GTC and DTC received from TOIFOR after formal complaints to NAMSA about TOIFOR's fraudulent mission allocation practices.

63.     When MonDee followed up with TOIFOR to find out why GTC and DTC did not receive any missions and/or TMRs, TOIFOR officials claimed that their reasons for not giving GTC and DTC subcontracts were performance based.

64.     When MonDee followed up with TOIFOR to find out why GTC and DTC did not receive any missions and/or TMRs, TOIFOR officials responded that they had not received any missions from the U.S. government.

65.     When MonDee asked TOIFOR officials to identify the person responsible for mission allocation, TOIFOR officials refused to answer.

*CONFIDENTIAL AND UNDER SEAL -- QUI TAM COMPLAINT*
*United States of America ex rel. MonDee v. TOIFOR et al.*

66.     Additionally, Layne, Newton, and Hele explained to MonDee that they awarded missions to whoever they wanted and did not have to answer to her.

67.     Eventually, GTC and DTC received so few TMRs that they had to release MonDee on or about March 31, 2012.

**IV.     MonDee's Disclosures**

68.     After witnessing the fraud and hearing complaints about it from Afghan nationals, MonDee researched how she could file a complaint about corruption in the NAMSA contract.

69.     On or about July 19, 2011, MonDee met with James Ethridge of Fernridge Strategic Partners, another transportation provider in Afghanistan, and asked him to go to the NAMSA office and find out who the contracting officer was. Ethridge did so and NAMSA employees informed him that Marc Muls was the contracting officer. Ethridge relayed this information to MonDee via email.

70.     In or about August 2011, MonDee met with Captain Kimberly Bowen, Sergeant Samuel Moreno, and Sergeant First Class Nicole Durbin at KAF's 645th and 655th registration office to inquire about the contracting process that the United States and NATO followed.

71.     Bowen, Moreno, and Durbin explained to MonDee that they could not address issues with NATO contracts but Captain Sylvain St. Gelais, the base contracting authority, would be able to address all base contracts.

72.     The staff at the 645th and 655th offices told MonDee that they received many complaints from Afghans regarding outstanding payments and corrupt practices, and would start to hand out MonDee's business cards to Afghans who approached them with problems.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States of America ex rel. MonDee v. TOIFOR et al.*

11

73.     In or about August 2011, MonDee met Katherine Leonard ("Leonard"), a SIGAR management analyst, at the 645th and 655th RSG registration office.

74.     When MonDee met Leonard, Leonard explained that she was interested in reaching out to Afghan nationals and help fight fraud and corruption in Afghanistan.

75.     Leonard explained to MonDee that she had heard MonDee's conversation with staff in the 645th and 655th RSG registration office, which took place in or about August 2011, and inquired about MonDee's position and interactions with Afghan subcontractors.

76.     Leonard explained to MonDee that SIGAR's role was to fight fraud and corruption and so MonDee asked for Leonard's contact information so she could follow up with Leonard regarding the fraud surrounding the TOIFOR contracts.

77.     On or about July 23, 2011, MonDee sent an anonymous email to Marc Muls, who was misrepresented by Layne as the contract officer at NAMSA.

78.     In her anonymous email to Muls on or about July 23, 2011, MonDee explained TOIFOR's ongoing fraudulent practices that she had witnessed and inquired about the proper ways to file a formal complaint.

79.     In her anonymous email to Muls on or about July 23, 2011, MonDee further detailed TOIFOR's fraud, noting that it awarded missions and/or TMRs based on bribes and kickbacks, it did not complete final billings, and it was not allocating missions and/or TMRs appropriately.

80.     MonDee never received a response to the anonymous email she sent to Muls on or about July 23, 2011.

*CONFIDENTIAL AND UNDER SEAL -- QUI TAM COMPLAINT*
*United States of America ex rel. MonDee v. TOIFOR et al.*

81.    On or about August 16, 2011, MonDee separately approached Sera Lalagavesi, HSCC's subcontractor liaison, and Layne, TOIFOR's Operations Manager, at the TOIFOR management office, about their personal relationship and how it created a conflict of interest for TOIFOR when awarding missions to subcontractors.

82.    Other TOIFOR staff was present during MonDee's conversation with Lalagavesi and Layne, on or about August 16, 2011.

83.    During the conversation, Lalagavesi told MonDee that her relationship with Layne was none of MonDee's business.

84.    During the conversation, MonDee told Lalagavesi that she planned to make a formal complaint and approached Layne.

85.    During the conversation, MonDee told Layne that his relationship with Lalagavesi was a conflict of interest for TOIFOR and HSCC, that it was not a surprise that the Afghan subcontractors complained about not receiving any missions from TOIFOR, and that Layne intimidated and threatened Afghans not to make formal complaints to TOIFOR about the mission allocation.

86.    Layne responded that his relationship with Lalagavesi and TOIFOR's practices were none of MonDee's business.

87.    MonDee asked Layne for the name of his direct supervisor, the TOIFOR tier up management for accountability, and NAMSA's contract officer.

88.    Layne responded that TOIFOR's contract officer was Muls and he asked MonDee to leave.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States of America ex rel. MonDee v. TOIFOR et al.*

89.     MonDee later discovered that NAMSA sends any complaints it receives to TOIFOR and Layne, but the complaints are not managed properly.

90.     On or about August 16, 2011, hours after confronting Lalagavesi and Layne, MonDee went to the NAMSA office and asked to speak with the contracting officer who managed the TOIFOR contract.

91.     MonDee was directed to speak with Nevario Tabussi ("Tabussi"), the TOIFOR contracting officer.

92.     Previously, Marc Muls had been misrepresented by Layne and Muls to MonDee and Ethridge as the contracting officer in charge of the TOIFOR contract.

93.     MonDee spoke with Tabussi regarding the breach of contract surrounding the TOIFOR contract and the conflict of interest created by the personal relationship between Lalagavesi and Layne.

94.     Muls arrived at the NAMSA office in the middle of MonDee's conversation with Tabussi.

95.     In the presence of Tabussi, MonDee asked Muls if Muls was the contracting officer and whether he had received an anonymous email about TOIFOR on or about July 23, 2011.

96.     Muls responded to MonDee that he had received the email but NAMSA does not follow up on anonymous emails and the sender of the email needs to identify him or herself.

97.     Muls placed the anonymous email on Tabussi's desk in front of MonDee.

98.     MonDee explained to Muls and Tabussi that she was there to to identify herself as the sender of the anonymous email and request information on the formal complaint process.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States of America ex rel. MonDee v. TOIFOR et al.*

99.     In short, Tabussi explained to MonDee that NAMSA preferred not to get involved in the complaints she was raising, despite MonDee's objections that TOIFOR was mismanaging the contract and NAMSA had a duty to investigate her claims.

100.    On or about August 16, 2011, after her conversation with Lalagavesi and Layne and after her conversation with Tabussi and Muls, MonDee wrote an email to Leonard asking for assistance in addressing complaints and corruption on NAMSA contracts.

101.    In her email to Leonard, MonDee expressed her concerns about lack of oversight which led to abusing Afghan subcontractors and corruption.

102.    Layne left TOIFOR roughly a month after MonDee confronted him on or about August 16, 2011.

103.    Leonard introduced MonDee to Special Agent Bob Hoitt ("Hoitt") of SIGAR.

104.    After repeatedly receiving complaints that TOIFOR was not awarding missions to some subcontractors on purpose, Layne sent an email to all subcontractors, writing:

> I will inform you that from today (20 July, 2011) that everything you do that is not in parallel with the BPA will be documented and sign by your company representative. I will hold you 100% accountable for every action so when you complain about no receiving mission you will know exactly why, this will just make it easy for anyone to see why they are not receiving business.

105.    MonDee emailed and met in person with Agent Hoitt and other agents, and shared with them specific details of the fraud she had witnessed at TOIFOR.

106.    MonDee gave Hoitt and his colleagues detailed information that would allow him to investigate TOIFOR.

107.    On or about August 17, 2011, MonDee gave Hoitt the email address for Alvo Vieweg, TOIFOR's former managing partner.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States of America ex rel. MonDee v. TOIFOR et al.*

15

108.    On or about August 17, 2011, MonDee supplied Hoitt with subcontractor details and contact information, which would have otherwise been difficult for Hoitt to obtain.

109.    On or about August 18, 2011, MonDee met Hoitt at the SIGAR/United States Department of State compound to discuss the fraudulent allocation of subcontracts, the personal relationship between Layne and Lalagavesi, as well as Hoitt's various information requests.

110.    On or about August 31, 2011, MonDee met Hoitt and St. Gelais at the SIGAR/United States Department of State compound.

111.    During her meeting with Hoitt and St. Gelais, MonDee revealed that she had witnessed a conflict of interest and issues with mission allocation by TOIFOR.

112.    During her meeting with Hoitt and St. Gelais, MonDee explained that Layne of TOIFOR and Lalagavesi of HSCC had a personal relationship, which was one of the reasons why TOIFOR was awarding all of its missions to HSCC.

113.    During her meeting with Hoitt and St. Gelais, MonDee explained that Layne and Lalagavesi were able to manipulate costs and fees to reflect that HSCC was the proper recipient of the missions TOIFOR allocated.

114.    During her meeting with Hoitt and St. Gelais, MonDee explained that NAMSA's and TOIFOR's practices were unregulated and as a result, the U.S. Government was paying for the Jingle Truck contract in excess.

115.    In or about August 2011, MonDee sent an email to Jim Jordan and Darryl Issa of the Congress House Oversight and Government Reform, explaining NAMSA's and TOIFOR's fraudulent mission allocation and stressed the need for accountability.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States of America ex rel. MonDee v. TOIFOR et al.*

116.    Hoitt referred MonDee to SIGAR Special Agent Christopher R. Thesing ("Thesing").

117.    Thesing requested that MonDee send him a written account of her observations and knowledge.

118.    On or about September 16, 2011, MonDee sent Thesing a detailed account of what she was witnessing, via email.

119.    In her email to Thesing, MonDee explained that she had repeatedly reached out to many sources, such as Layne, Tabussi, Muls, Leonard, St. Gelais, as well as KAF's 645th and 655th registration offices, among other individuals at SIGAR, to disclose the fraud she witnessed daily, but they all told her that they were unable to provide any help to examine and stop the fraud.

120.    In her email to Thesing, MonDee explained that Thesing would be able to uncover details of the fraud she was disclosing by simply interviewing subcontractors.

121.    In her email to Thesing, MonDee named key individuals who would serve well as the first ones to be interviewed in order to uncover the fraud she was disclosing.

122.    In her email to Thesing, MonDee further emphasized that the fraud associated with the Jingle Truck contract directly affected the United States Government and caused the Government to pay out in excess of what it would have if the allocation of missions and/or TMRs were regulated.

123.    In her email to Thesing, MonDee explained that she personally observed that the disbursement of funds through NAMSA, all the way through the NATO tier, was not regulated.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States of America ex rel. MonDee v. TOIFOR et al.*

17

124.    Thesing introduced MonDee to SIGAR Special Agent John 'Eddie' Edmiston ("Edmiston").

125.    MonDee communicated with Edmiston the most out of all the agents she worked with.

126.    On or about August 25, 2011, Relator met with Leonard at the KAF French Café and Boardwalk and gave Leonard specific and detailed information about the transport and mission allocation, TOIFOR's corrupt practices, and Layne and Lalagavesi's fraudulent acts to award subcontracts to HSCC.

127.    During her meeting with Leonard, MonDee informed Leonard that she had tried repeatedly to seek answers as to why TOIFOR favored HSCC so heavily, but each time TOIFOR intimidated her and shut her out so she was unable to find answers.

128.    On or about September 27, 2011, MonDee met with Thesing at the KAF French Café and Boardwalk to discuss the mission allocation fraud and corruption.

129.    In her meeting with Thesing, MonDee confirmed the names and pictures of Lalagavesi and Newton and talked about the fraud and their role in the fraud in great detail.

130.    Additionally, Thesing and MonDee discussed that Thesing and the Federal Bureau of Investigation had approached the French government for more information about mission allocation through NAMSA.

131.    Thesing explained to MonDee that the FBI had approached the French government because it wanted records on mission allocation so that it could reconcile the missions and dollar values and investigate the fraud that MonDee had brought to the FBI's attention.

*CONFIDENTIAL AND UNDER SEAL -- QUI TAM COMPLAINT*
*United States of America ex rel. MonDee v. TOIFOR et al.*

132.     During her September 27, 2011 meeting with Thesing, Thesing provided MonDee several documents and asked her whether she could confirm the number of TMRs and missions TOIFOR awarded to HSCC and the dollar amounts associated with them. MonDee confirmed the information Thesing presented to her and the names of Afghan subcontractors working with TOIFOR.

133.     Thesing and the FBI had also approached NATO, NAMSA, and TOIFOR to ask for records on mission allocation.

134.     The U.S. representatives at NAMSA approached Newton, asking questions in an attempt to trace the funds disbursed to TOIFOR through NAMSA for the transportation missions.

135.     In or about October 2011, MonDee and Newton were in the same office, when Newton voluntarily disclosed to MonDee that he was worried that the U.S. would not allocate any more TMRs/missions or funds to TOIFOR.

136.     Newton explained to MonDee that he was worried that TOIFOR would lose the contract from NAMSA.

137.     Shortly after Newton's disclosures to MonDee, in or about October 2011, Newton called for a meeting with all the Afghan providers.

138.     Newton had trouble finding a place to hold the meeting with the Afghan providers and asked Hamidullah LNU[3], Director of GTC, if he could hold the meeting at the compound.

139.     At first, Hamidullah declined to allow Newton to hold his meeting at the compound but ultimately, he agreed to have the meeting at the compound.

---

[3] Last name unidentified.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States of America ex rel. MonDee v. TOIFOR et al.*

140.   Newton told Hamidullah that he did not want MonDee to attend the meeting, but Hamidullah pushed for MonDee to attend the meeting with the Afghan providers.

141.   At the meeting with the Afghan providers, Newton explained that the U.S. did not want to work with TOIFOR anymore and that TOIFOR had spent all the money it had received from the U.S. government.

142.   At the meeting with the Afghan providers, Haji Sadikq represented the Afghans and asked Newton about the flow of money and how the Afghans could help TOIFOR keep receiving contracts from the U.S.

143.   Newton did not explain the flow of funds to Sadikq, but explained that it would be helpful for the providers to drive down prices.

144.   Sadikq responded that the prices were already low and if the providers priced their services any lower, their businesses would not survive.

145.   Nevertheless, Sadikq agreed that the providers would lower their prices.

146.   After the meeting with the Afghan providers, MonDee asked Rahmat why Sadikq agreed to lower prices.

147.   Rahmat explained to MonDee that the Afghans agreed to lower their prices because they were interested to see if lowering prices would help them receive missions and/or TMRs, like Newton had said it would.

148.   After this meeting with the Afghan providers, in or about October 2011, MonDee gave Edmiston a detailed account of the meeting she attended.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States of America ex rel. MonDee v. TOIFOR et al.*

149.    In an email on or about November 29, 2011, Edmiston informed MonDee that SIGAR was going to take her disclosures "very seriously" and would was "working on getting to the bottom of the situation."

150.    MonDee and Edmiston continued to meet and email to discuss the fraud in significant detail, encompassing various disclosures that led to SIGAR uncovering fraud and the U.S. Government's eventual seizure of the Defendants' assets.

151.    Throughout her communication with Edmiston, MonDee continued to direct Edmiston to additional facts relating to the frauds she was witnessing, as well as to potential witnesses who could provide him with more information.

152.    On or about December 1, 2011, MonDee met Edmiston at the SIGAR/United States Department of State compound and discussed an overview of the mission allocation fraud and the functions of each entity and individual involved.

153.    In an email on or about December 3, 2011, MonDee told Edmiston that he should investigate Hele.

154.    MonDee served as an intermediary between Edmiston and witnesses he wanted to interview to extract details about the fraud.

155.    On or about December 7, 2011, Edmiston asked MonDee if she could set up an opportunity for Edmiston to interview Sadar Wali and Mohammad Nasir. Edmiston, to determine whether these individuals had any information suggesting that TOIFOR and its representatives were receiving kickbacks from Afghan subcontractors in return for winning missions of the Jingle Truck contract.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States of America ex rel. MonDee v. TOIFOR et al.*

21

156.   MonDee worked closely with Afghan subcontractors and TOIFOR, and thus was well aware of their thought process and apprehension in assisting an investigation into TOIFOR.

157.   Because of her direct contact with the Afghan subcontractors and TOIFOR, MonDee was able to provide intimate knowledge of the fraud she witnessed to Edmiston and his team of investigators to enable him to carry out a successful investigation of NAMSA and TOIFOR.

158.   On or about December 7, 2011, MonDee advised Edmiston that he would have to assure the individuals he interviewed that he would not allow for TOIFOR to retaliate against them.

159.   On or about December 7, 2011, MonDee explained to Edmiston that TOIFOR had "smoke and mirrored their way to god like status by holding missions and money over these companies working to feed their families," so the Afghan subcontractors, who witnessed the fraud firsthand, were afraid of TOIFOR's retaliation, and thus reluctant to participate in the audit.

160.   Edmiston questioned MonDee about how TOIFOR officials accepting bribes transferred the money out of Afghanistan.

161.   MonDee explained to Edmiston that common methods of transferring money from Afghanistan included mailing money via DHL, Western Union, and wire transfers.

162.   In another email on or about December 7, 2011, Edmiston asked MonDee to inform Sardar and Nasir that Edmiston was acting on behalf of the U.S. Government and the Department of Justice, and therefore had authority to investigate and end the ongoing fraud.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States of America ex rel. MonDee v. TOIFOR et al.*

163.    As Edmiston's investigation of TOIFOR and its subcontracts expanded, he asked MonDee not to tell anyone that she was working with him or that the U.S. Government was investigating the Jingle Truck contract.

164.    On or about February 28, 2012, MonDee submitted a letter to General Dennis and Lieutenant Colonel Kirkpatrick, discussing the fraud she regularly witnessed.

165.    In her letter to Dennis and Kirkpatrick, MonDee included a proposal to cut down the corruption.

166.    MonDee helped Edmiston arrange a meeting with General Gulalai, the owner of GTC, in April 2012. Gulalai was aware that TOIFOR unfairly awarded HSCC missions.

167.    At the time MonDee helped Edmiston arrange this meeting, the Federal Bureau of Investigation did not allow Edmiston to carry through with this meeting because the FBI believed it would be dangerous for Edmiston to attend such a meeting.

168.    On several occasions throughout 2011 and 2012, in person and via email, MonDee had discussions with Leonard, Hoitt, and Edmiston about TOIFOR's fees, operations management, allocation of missions to HSCC, and the fear among Afghan subcontractors to cause trouble.

169.    In or about July 2012, based on MonDee's disclosures to Leonard, Hoitt and Edmiston, SIGAR conducted a search of TOIFOR.

170.    Edmiston wrote to MonDee to inform her of SIGAR's investigation of TOIFOR, and he said that he would share more information with her when he was at liberty to.

171.    In or about September 2013, an acquaintance on the sub-provider TOIFOR contract sent MonDee an article titled "U.S. freezes bank account of Afghan contractor accused

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States of America ex rel. MonDee v. TOIFOR et al.*

23

on bribery." The article discussed the U.S. Government's seizure of assets belonging to

Shadman, HSCC, and others.[4]

172.    MonDee shared the article with Edmiston and Edmiston replied on or about

September 3, 2013, explaining that the asset freezes were a result of the information MonDee

had shared with Leonard two years prior. Edmiston wrote, "This is our case, the one you spoke

with Katherine [Leonard] about almost 2 years ago."

**V. Relator's Disclosures Led to Government's Claim against Defendants**

173.    MonDee's disclosures to Leonard, Hoitt, and Edmiston led to the U.S.

Government's claim against Defendant's and the successful *in rem* action against several bank

accounts to seize assets of several individuals and entities named as Defendants in this

Complaint (Case No. 12-cv-01905 (RWR)).

174.    MonDee's disclosures to Leonard, Hoitt, and Edmiston led the United States

Government to the information it used for its Second Amended Complaint for Forfeiture In Rem.

175.    MonDee is a confidential source of information to the government which led the

government to successfully bring the United States' Second Amended Complaint for Forfeiture

In Rem.

176.    Relator is most probably the government's fourth confidential source, identified

as CS-4 in the United States' Second Amended Complaint for Forfeiture In Rem.

---

[4] http://washingtonexaminer.com/u.s.-freezes-bank-account-of-afghan-contractor-accused-of-bribery/article/2534119

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States of America ex rel. MonDee v. TOIFOR et al.*

<u>COUNT I</u>
**Violations of the False Claims Act**
**31 U.S.C. §§ 3729(a)(1)(A)**
**Against All Defendants**

177.    MonDee realleges and incorporates the allegations set forth above as though fully alleged therein.

178.    By virtue of the acts described in the preceding paragraphs, Defendants knowingly presented or caused to be presented to the United States false or fraudulent claims for payment or approval in violation of the FCA.

179.    Defendants knowingly presented falsified TMR reports and inflated reports to NATO's NAMSA to increase the payment amount they received from the U.S. Government.

180.    As a result of Defendants' inflated reports, the U.S. Government paid for Jingle Truck missions in excess of the cost of the missions.

181.    By reasons of the acts and conduct of Defendants in violation of 31 U.S.C. § 3729(a)(1)(A), the United States has suffered actual damages, including the total amounts paid in response to all such false or fraudulent claims for payment.  In addition, the United States is entitled to recover civil money penalties, and other monetary relief as deemed appropriate.

<u>COUNT II</u>
**Violations of the False Claims Act**
**31 U.S.C. §§ 3729(a)(1)(B)**
**Against All Defendants**

182.    MonDee realleges and incorporates the allegations set forth above as though fully alleged therein.

183.    By virtue of the acts described in the preceding paragraphs, Defendants knowingly made and used, and continue to make and use, of false records to submit false records

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States of America ex rel. MonDee v. TOIFOR et al.*

25

of mission allocation in order to receive funds from the U.S Government in excess of the cost of the missions.

184.    Defendants knowingly submitted falsified TMR reports and inflated expense reports to NATO's NAMSA to increase the payment amount they received from the U.S. Government.

185.    Because the U.S. government disburses funds to the Defendants in excess of the cost of the missions, the Defendants make a profit by falsifying records they submit to the U.S. Government.

186.    By reasons of the acts and conduct of Defendants in violation of 31 U.S.C. § 3729(a)(1)(B), the United States has suffered actual damages, including the total amounts paid in response to all such false or fraudulent claims for payment.  In addition, the United States is entitled to recover civil money penalties, and other monetary relief as deemed appropriate.

**<u>COUNT III</u>**
**Conspiracy to Submit False Claims**
**31 U.S.C. § 3729(a)(1)(C)**
**Against All Defendants**

187.    MonDee realleges and incorporates the allegations set forth above as though fully alleged therein.

188.    Defendants conspired to obtain payments from the U.S. Government for transportation contract. Defendants demanded and received bribes and payments and also inflated prices of contracts in order to receive a large payment from the U.S. Government. Because of the actions of the Defendants, the U.S. Government paid out millions of dollars in excess of what it should have for the transportation contracts.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States of America ex rel. MonDee v. TOIFOR et al.*

26

189.   By reasons of the acts and conduct of Defendants in violation of 31 U.S.C. § 3729(a)(1)(C), the United States has suffered actual damages, including the total amounts paid in response to all such false or fraudulent claims for payment.  In addition, the United States is entitled to recover civil money penalties, and other monetary relief as deemed appropriate.

190.   The operations of the Defendants named in this action are so intertwined that they are effectively acted as one entity to defraud the U.S. Government.

191.   Through their conspiracy to defraud the U.S. Government, Defendants have received $77,920,605 from the U.S. Government, through NATO's NAMSA.

**COUNT IV**
**Violations of the False Claims Act**
**31 U.S.C. § 3729(a)(1)(G)**
**Against All Defendants**

192.   MonDee realleges and incorporates the allegations set forth above as though fully alleged therein.

193.   By virtue of the acts described in the preceding paragraphs, Defendants knowingly made and used, and continue to make and use, false records and statements to transmit money from the federal government.

194.   Further, Defendants knowingly concealed and knowingly avoided an obligation to transit money to the federal government.

195.   By reasons of the acts and conduct of Defendants in violation of 31 U.S.C. § 3729(a)(1)(G), the United States has suffered actual damages, including the total amounts paid in response to all such false or fraudulent claims for payment.  In addition, the United States is entitled to recover civil money penalties, and other monetary relief as deemed appropriate.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States of America ex rel. MonDee v. TOIFOR et al.*

## COUNT V
### Anti-Kickback Statute Violations
### 42 U.S.C. § 1320a-7b
### Against All Defendants

196.    MonDee realleges and incorporates the allegations set forth above as though fully alleged therein.

197.    Defendants, by and through their officers, agents, supervisors, and employees, knowingly presented and caused to be presented to the U.S. Government and its officials false records or statements material to false or fraudulent claims and knowingly failed to disclose material facts in order to obtain payment from the U.S. Government through NATO's NAMSA.

198.    Defendants knowingly demanded and accepted kickbacks from subcontractors in exchange for promises to awards the subcontractors Jingle Truck missions allocated by NAMSA.

199.    The United States Government, unaware of the falsity of the claims made by Defendants and in reliance of the accuracy thereof, paid Defendants for such false or fraudulent claims.

200.    42 U.S.C. § 1320a-7b(g) provides that a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of the federal False Claims Act.

### PRAYER FOR RELIEF

WHEREFORE, the Relator Heather MonDee, acting on behalf of and in the name of the United States of America, and on her own behalf, prays that judgment be entered against Defendants for violations of the False Claims Act as follows:

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States of America ex rel. MonDee v. TOIFOR et al.*

(a)     In favor of the United States against the Defendants for treble damages to the

Federal Government from the submission of false claims, and the maximum civil penalties for

each violation of the False Claims Act;

(b)     For all costs of the False Claims Act civil action; and

(c)     In favor of the Relator and the United States for further relief as this court deems

just and equitable.


Respectfully submitted,


_____
R. Scott Oswald
David L. Scher
The Employment Law Group, P.C.
888 17th Street, N.W., Suite 900
Washington, D.C. 20006
(202) 261 – 2810
(202) 261 – 2835 (facsimile)
dscher@employmentlawgroup.com
*Counsel for Plaintiff-Relator*


## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator Heather MonDee

demands a jury trial.


*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States of America ex rel. MonDee v. TOIFOR et al.*

29

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via UPS,

on this 11th day of August, 2014, upon:

> Eric Holder, Esq.
> Attorney General of the United States
> Office of the Attorney General, Civil Division
> U.S. Department of Justice
> 950 Pennsylvania Avenue, NW
> Washington, DC  20530-0001
>
> Ronald C. Machen, Jr.
> United States Attorney
> District of Columbia
> U.S. Attorney's Office
> 555 4th Street, NW
> Washington, DC 20530

David L. Scher

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States of America ex rel. MonDee v. TOIFOR et al.*